## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CARLOUS O. STRICKLAND,

                Plaintiff,

vs.                                       Case No. 3:02-cv-902-J-32HTS

UNITED STATES OF AMERICA,

                Defendant.

_____

## ORDER

In this admiralty lawsuit, plaintiff Carlous O. Strickland asserts that

defendant United States of America owes him $450,000 in quantum meruit for

work that he performed on a government-owned vessel.  (Doc. 1.)  The

government now moves for summary judgment.[1]  (Doc. 87.)

**I.**    **Facts**[2]

The facts are largely undisputed.  The USNS ANTARES is a 946-foot Fast

Sealift Ship stationed in Jacksonville and used by the Navy to rapidly transport

military cargo to ports around the world.  The USNS ANTARES, and the seven

_____

[1]    The Court previously dismissed with prejudice plaintiff's unjust enrichment claim.  Details about other summary judgment motions filed by the government are in the orders dated May 5, 2004 (Doc. 67) and October 22, 2004  (Doc. 86).

[2]    In deciding summary judgment, the Court views the facts in the light most favorable to plaintiff and draws all justifiable inferences in his favor.  Gillis v. Georgia Dept. of Corr., 400 F.3d 883, 884 n.2 (11th Cir. 2005).

other Fast Sealift Ships used by the Navy, were built in Germany in the early 1970s for a private shipping company that later sold them to the government.

Although government owned, the Fast Sealift Ships are privately maintained and operated pursuant to a contract between the government and American Overseas Marine Corporation ("AMSEA"), an affiliate of General Dynamics Corporation ("General Dynamics").  AMSEA provides the officers, crews, equipment, tools, provisions, and supplies necessary to keep the Fast Sealift Ships in a state of high readiness so that they can respond to a military crisis on short notice.  The AMSEA contract is overseen by the Navy's Military Sealift Command ("MSC").[3]

In September 2000, after learning from an inspection that USNS ANTARES' "Deep Ballast Tank Number 2" was in poor condition, AMSEA invited bids for the provision of labor and materials necessary to prepare and re-paint the tank. Plaintiff, who had worked for the Navy for approximately 20 years before starting a boat repair business known as "Strickland Marine," responded to and was awarded the bid in the amount $257,250.  Plaintiff had experience, and therefore was familiar, with contracts involving government-owned vessels.

The bid specification set forth the scope of work:

---

[3]    The MSC provides "ocean transportation ... for the Department of Defense with the responsibility of providing strategic sealift and ocean transportation for all military forces overseas."  See http://www.msc.navy.mil (MSC homepage).

> PROVIDE LABOR AND MATERIAL TO PERFORM FRESH WATER
> PRESSURE WASH, CHEMICAL CLEAN/DRY, SP-10 BLAST
> PREPARATION, DEHUMIDIFICATION, AND PAINT APPLICATION
> AS DIRECTED ... OF #2 DEEP BALLAST TANK ... .

(Doc. 94, Ex. C.)  The bid specification commented that it was not anticipated that

hazardous waste would be generated from the job, but set forth specifications if

hazardous waste was generated:

> IT IS NOT EXPECTED THAT HAZARDOUS WASTE WILL BE
> GENERATED IN THE PERFORMANCE OF THIS WORK ORDER.
> HOWEVER IF SUCH WASTE IS GENERATED IT IS TO BE
> MANAGED IN ACCORDANCE WITH THE ATTACHED
> ENVIRONMENTAL TERMS AND CONDITIONS.

(Doc. 94, Ex. C.)

Plaintiff began work on the tank on January 8, 2001.  After doing preliminary

work of opening the tank, releasing gas, and installing staging, lighting, and de-

humidifiers, plaintiff determined through a chemical analysis that the existing paint

was lead based.

Plaintiff's primary contact for the job, from whom he received any necessary

information and direction, was Herschell Carswell, an AMSEA port engineer in

Jacksonville.  Plaintiff informed Carswell of the lead paint around January 21,

2001, at which time Carswell stopped the work until he could determine the best

way to proceed.  According to Carswell, he had never encountered a situation with

lead paint aboard the ships during his many years of naval management

experience and therefore had no reason to think at the time the job was bid that

-3-

the tank was coated with lead paint.[4]

During the three week period that followed plaintiff's discovery of the lead paint, the USNS ANTARES was being moved to another berth and, accordingly, plaintiff's workers could not do any work on the tank.  Meanwhile, plaintiff and Carswell had many discussions about the best way to proceed and how much extra work would be required to safely handle the lead paint.  Initially, Carswell asked plaintiff to obtain quotes from vendors who specialize in the removal and disposal of hazardous material.  Plaintiff did so and, on or about January 26, 2001, provided Carswell with vendor quotes together with his estimate that the work would involve $257,000 in additional costs.  Carswell summarized the situation in his January 29, 2001 weekly report to Tom Merrell, his AMSEA supervisor:

> #2 Ballast Tank in progress.  Old paint analyzed as lead base resulting in HAZMAT situation.  Pricing for this job has gone out of site [sic].  As we discussed this morning, I'm looking into other options. Have stopped the job until I can sort this out.  This Contractor has opened the tank, gas freed, installed lighting and staging.

(Doc. 91, Ex. B.).

Presumably in response to this report, Merrell instructed Carswell to subcontract the hazardous material work to Safety- Kleen Systems, Inc. ("Safety-Kleen"), a company that specializes in such work and had an existing contract with

---

[4]   Carswell took his own samples and verified that the paint was lead based. He also learned that the paint contained other materials that could be hazardous in certain quantities, including arsenic and barium.

General Dynamics.  As instructed, Carswell told plaintiff that AMSEA would subcontract with, and plaintiff should coordinate with, Safety-Kleen rather than the vendors from whom plaintiff had received quotes to remove and dispose of any hazardous material generated by the job.

Thereafter, in a letter dated February 9, 2001, plaintiff informed Carswell that he would use hydro-blasting instead of grit blasting, that hydro-blasting would be an effective way to remove the lead paint while reducing exposure to workers, and that he would coordinate the removal and disposal of hazardous material with Safety-Kleen at AMSEA's cost.  At the bottom center of the letter, plaintiff wrote: "Additional Cost: $232,250.00."  (Doc. 91, Ex. D.)  When Carswell read the letter, he thought that plaintiff was reducing the original contract price by $25,000, from $257,250 to $232,250 because the disposal work that plaintiff had planned to perform was going to be performed by Safety-Kleen.  Carswell informed Merrell that plaintiff would be giving AMSEA a refund, then filed the letter.  In a report dated February 13, 2001, Carswell reported that the hazardous material situation had been resolved.  (Doc. 91, Ex. C.)

On or about February 16, 2001, the USNS ANTARES was docked at its new berth, thereby allowing plaintiff to resume work, which included hydro-blasting and priming.  Safety-Kleen began its removal and disposal work on or about February 21, 2001 in coordination with plaintiff's work.

At some point in time that is unclear from the record, plaintiff told Carswell that he was in a dire financial situation and needed money to avoid bankruptcy. Carswell thereafter told plaintiff's son that plaintiff might be eligible for reimbursement of any expenses that he incurred as a result of stopping work during the time period that Carswell was deciding how to proceed in light of the lead paint.[5]  Presumably in response to this suggestion, plaintiff gave Carswell a letter dated March 5, 2001 in which he asked AMSEA for $64,010.95 to compensate him for delay and disruption.

Typically, when Carswell determines that there is a need for an expenditure for the USNS ANTARES, he writes what is called an "industrial assistance" ("IA"). Carswell  presents the IA to his government contact, Tom Cisewski.  Cisewski is a Charleston-based MSC port engineer with responsibilities covering ships docked at berths from Wilmington to Jacksonville.  Cisewski reviews IAs from Carswell to independently verify a need for the expenditure.  If an IA is $10,000 or less, Cisewski can give what is called "technical certification" for it.  If an IA is between $10,000 to $25,000, Cisewski must forward it to his New Orleans-based supervisor, James Gunter, for technical certification.  If an IA is above $25,000, Cisewski or Gunter must forward it to Reyn Schuttler, the Washington D.C.-based

---

[5]      It is unclear from the record how much of this time, if any, overlapped with the period of time that the USNS ANTARES was changing berths.

government contracting officer for the Fast Sealift Ships.  In his deposition,

Cisewski emphasized that technical certification is only certification that the work is

needed; it is not authorization for government money to be spent.  Indeed, neither

Cisewski nor Gunter have a certificate of appointment empowering them to enter

into contracts on behalf of the government.  Cisewski testified that the same

process works for change orders relating to existing contracts between AMSEA

and subcontractors.[6]

　　　　Carswell believed that the $64,010.95 requested by plaintiff for delay and

disruption was warranted.  He therefore brought it to Cisewski's attention through a

change order to the initial IA for the job.  Cisewski also thought the amount was

warranted, though Cisewski thought that the amount was for delay, disruption, and

any extra work that plaintiff had to perform because the paint was lead based,

such as providing workers with special clothing and inhalants.  Cisewski signed the

change order on March 7, 2001 then sent it to Gunter.

_____

[6]　　　Gunter is a contracting officer representative for Schuttler.  His appointment
cautioned:

> You are *not* authorized by this letter to take any action, either directly
> or indirectly, that could result in a change in the cost/price, quantity,
> quality, place of performance, delivery schedule, or any other terms or
> conditions of the contract or to direct the accomplishment of effort
> which would exceed the scope of the basic contract.  You may be held
> personally liable for any unauthorized acts.

(Doc. 94, Ex. B, ¶ 2 (emphasis in original).)

Around the same time, plaintiff was talking to Carswell about compensation for extra work that plaintiff had to perform or expenses that he had to incur because the paint was lead based.  Carswell believed that plaintiff was entitled to additional compensation, but wanted plaintiff to produce a condition report and documentation.  In a weekly report dated March 5, 2001, Carswell advised Merrell that plaintiff's work continued and he was "[a]waiting information from [plaintiff] concerning additional funding requirements."  (Doc. 91, Ex. B.)

On or about March 9, 2001, plaintiff went to Carswell's office.  At that time, Cisewski was working at a desk that Carswell had set up for him to use when he worked in Jacksonville.  During the meeting, Cisewski said that plaintiff should provide him with his request for additional monies and that he would see that plaintiff got paid.  According to Cisewski, any compensation for extra work was conditioned on plaintiff providing documentation: "We needed some documentation so we could give - - we could review it and if we agreed to it, give technical certification to it and then forward it up to the line to our bosses and the contract officers."  (Doc. 91, Ex. G, 32:16-20.)  Cisewski described the meeting:

> I believe there was one time we sat down and said, you know, let's proceed, you know, that was after the first change order, let's proceed, so there was discussions to proceed. ...  I believe I said it's in MSC's best interest - - that we - - since the contractor has a lot of his equipment onboard, that we could proceed in a safe and reasonable manner, its better to - - to proceed.

(Doc. 91, Ex. G, 69:5-16.)

In the next weekly report dated March 12, 2001, Carswell advised Merrell that hydro-blasting would be completed that week and that he was still "[a]waiting information from [plaintiff] concerning additional funding requirements."  (Doc. 91, Ex. B.)  On or about the same day, plaintiff provided Carswell with a one-page statement requesting $232,000 in additional compensation.  Carswell was taken aback by this request since he had expected that plaintiff would be presenting documentation for minor costs.  According to Carswell:

> [Plaintiff] was asked to provide documentation for monies that he had to spend for handling of hazardous waste which was in excess of his original contract.
>
> This document had nothing to do with that.  There is nothing in this document that has anything to do with additional monies because of him handling Hazmat.  And not only that, but there's irregularities in that document.

(Doc. 91, Ex. F, 70:3-11.)  Cisewski, upon learning of the request, was "shocked." (Doc. 91, Ex. G, 71: 7.)  He testified that he and Carswell had expected the amount of any additional compensation to be in the range of $50,000 to $100,000. At some point in time that is not clear from the record, Carswell communicated the situation to Merrell.  Merrell became exasperated and instructed that plaintiff could do the job at the original contract price and no more.  Merrell suggested that the job should be shut down, but Carswell did not think that was necessary.

In addition to the issues of lead paint and whether plaintiff was due

-9-

additional compensation, there was also an issue between plaintiff and Carswell

over whether plaintiff should have been using a ramp on the USNS ANTARES for

moving his trucks and equipment to the tank at the government's risk and expense

as opposed to using a barge for such purposes at plaintiff's risk and expense.  This

issue culminated in an argument between plaintiff and Carswell on March 14,

2001, during which Carswell instructed plaintiff that he could not use the ramp after

March 16, 2001 because the USNS ANTARES was being moved.  Carswell also

handed plaintiff the one-page statement in which plaintiff requested $232,000 in

additional compensation.  Carswell told plaintiff that he could not submit it for

reimbursement unless and until plaintiff provided documentation.[7]  At some point,

plaintiff said that he would quit the job then left the office, slamming the door

behind him.  Later that day, plaintiff returned, apologized to Carswell, and indicated

that he wanted to complete the job, but with additional compensation.  Carswell

told plaintiff that he should leave by the end of the week.  Plaintiff instead left and

never returned to complete the work.  The parties dispute how much work plaintiff

_____

[7]       Neither party discusses the applicability, if any, of 10 U.S.C. § 7311(b),
which states that "The Secretary of the Navy shall renegotiate a contract [entered
into for work on a naval vessel] if - - (1) the contractor, during the performance of
work under the contract, discovers hazardous wastes different in type or amount
from those identified in the contract; and (2) those hazardous wastes originated on,
or resulted from material furnished by the Government for, the naval vessel on
which the work is being performed."  It appears that Carswell attempted to
negotiate compensation for any extra work plaintiff performed, but was not
satisfied with the one-page statement that plaintiff produced.

had completed as of the day he left, with plaintiff arguing that he substantially completed the job and with AMSEA and the government arguing otherwise. AMSEA ended up paying plaintiff $127,500, approximately half of the original contract amount.

As set forth in more detail in the Court's May 5, 2004 order (Doc. 67), plaintiff sued AMSEA in state court for damages, stating that the value of his services was $650,000.  Following a bench trial, the state court awarded him $174,783.40 plus pre-judgment interest.  The state court arrived at this figure by concluding that AMSEA owed plaintiff the balance of the original $257,250 subcontract in the amount of $129,750 plus delay and disruption damages in the amount of $45,033.40.  The state court did not award plaintiff any damages in quantum meruit, finding that "as a result of [plaintiff's] poor record keeping, the Court is unable [to] determine with any specificity, the damages necessary to support a quantum meruit claim in excess of the original contract price."  (Doc. 53, Ex. 3, p. 11-12.)  Plaintiff then filed this case against the government to seek what he was not awarded in state court plus some additional amounts.  After considerable motion practice, the Court permitted plaintiff's claim for quantum meruit to proceed.

Plaintiff's counsel has taken numerous depositions to determine the amount and type of government involvement with plaintiff's work on the tank over and

above Cisewski's involvement, including depositions of Schuttler, the Washington

D.C.-based government contracting officer for the Fast Sealift Ships, Gina Lee, a

Washington D.C.-based contract specialist who worked for Schuttler, and Rasheed

Kahn, a Washington D.C.-based MSC senior naval engineer.

In opposition to summary judgment, plaintiff has filed several weekly reports

that Carswell had sent to the attention of Schuttler and Kahn during the relevant

time period.  In these weekly reports, Carswell summarized happenings aboard the

USNS ANTARES, including summaries about plaintiff's work on the tank.  The

following are relevant excerpts from each of the weekly reports:

| | |
|---|---|
| January 23, 2001 | Work commenced on 08 Jan 01.  ETC 09 Mar 01.  Old paint coating analyzed as lead base.  Working to solve HAZMAT disposal problem. |
| January 30, 2001 | Old paint coating analyzed as lead base which will dramatically increase price to accomplish removal of HAZMAT.  Evaluating other alternatives.  Will advise. |
| February 13, 2001 | HASMAT [sic] situation resolved.  Removal of rust and hydro-blasting in progress. |
| February 20, 2001 | Hydro-blasting and priming in progress. |
| February 27, 2001 | Hydro-blasting and priming in progress.  Approximately 1/3 complete blasting/priming. |
| March 6, 2001 | Hydro-blasting and priming in progress.  Estimate one (1) more week of blasting.  Estimate three (3) more weeks to complete the job.  Because paint that is being removed |

> was discovered to be lead based, the contractor is requesting additional funding for handling the material and for the delays incurred when the lead was discovered. Additional costs are being negotiated.

March 13, 2001        Hydro-blasting is approx 90% complete and priming is at 60%.  Job should complete in 3 more weeks.  Still negotiating with the contractor over additional funding.

(Doc. 91, Ex. C.)

Schuttler testified that, as the contracting officer for the Fast Sealift Ships, he is the only one who can authorize expenditures over $25,000 for the Fast Sealift Ships.  Schuttler testified that he did not recall seeing any of Carswell's weekly reports and that he was unaware of any problems with plaintiff's work, that work stopped for a period of time, or that AMSEA was negotiating additional compensation requested by plaintiff.  Schuttler explained that although the weekly reports were sent to his attention, they ordinarily would be directed to and reviewed by Lee as his contract specialist.

In her deposition, Lee explained that she did not have authority to obligate the government, but would review AMSEA requests, prepare related paperwork, and present them to Schuttler for his signature.  However, Lee also testified that "there were a lot of works that I authorized without [Schuttler's] review.  Because by then, I had [sic] number of years of experience doing this, you know, routine approvals: IA authorizations, subcontracting authorizations, that I did not have to

-13-

go through [Schuttler.]" (Doc. 91, Ex. J, 12:5-10.)  Lee explained that, with respect

to plaintiff's work:

> [I]n the beginning, it did not go through [Schuttler].  I looked over, just
> like I do with all the other [IA] authorizations I gave.  And I believe I
> just gave authorization.  Anything above 25,000 dollars had to come
> to the headquarters here at MSC for contracting officer approval.
> That's the way contract is written for [IA].
>
> And so any work above 25,000 dollars has to come through the
> contracting shop here.  And that's - - that's when I authorized.  And so
> that's how - - when I first learned it, I guess, before it got to be
> problematic.

(Doc. 91, Ex. J, 12:12-22, 13:1-2.)  Lee testified that she learned through e-mails

from Cisewski that work had stopped because of lead paint.  She testified that she

next learned that AMSEA would be using Safety-Kleen for the removal and

disposal of any hazardous material, and that she accordingly prepared an

additional IA for Safety-Kleen's work.  Lee testified that she next learned that

plaintiff had "walked off the job" (Doc. 91, Ex. J, 19:20-21) and "we sat around for a

long time deciding who's going to finish the job" (Doc. 91, Ex. J, 19:10-11).

In his deposition, Kahn explained his job: "my role is to provide technical

input to whatever happens on these [Fast Sealift Ships].  Since I'm an engineer,

my job [is] to make sure that mechanically these ships are sound."  (Doc. 91, Ex. I,

56:22, 57:1-3.)  Kahn testified that he had limited involvement with the work

performed by plaintiff.  He testified that he had reviewed the original bids to

determine how much the job would cost.  Later, he heard that lead paint had been

-14-

found, but did not take any action because:

> As far as I know, AMSEA decided to take care of the - - they got in
> negotiation with the contractor.  And they said they will identify and
> resolve the problem.  And then a few weeks later, we found out that
> the job has been terminated, or the contractor has walked off the job.

(Doc. 91, Ex. I, 32:9-14.)  Kahn denied seeing any of Carswell's weekly reports

directed to his and Schuttler's attention except the one dated February 13, 2001

stating that the situation had been resolved and the one dated March 13, 2001

stating that the job was nearing completion and AMSEA was still negotiating with

plaintiff.[8]  Kahn testified that between the time that he found out about the lead

paint and the time he found out that plaintiff had left the job, he did not know that

plaintiff continued with the work.

Schuttler, Lee, and Kahn each testified that they were unaware of the

presence of lead paint when AMSEA was soliciting bids.  To attempt to undermine

this testimony, plaintiff deposed Cary Byron who had served as a port engineer for

Bay Ship Management, Inc., the company that had the Fast Sealift Ship contract

before AMSEA.  Byron testified that, to the best of his recollection, Kahn was

present during a 1998 or 1999 meeting during which refurbishment of the tanks

aboard the Fast Sealift Ships was discussed, including whether they were coated

with lead paint.   Byron also testified that the Fast Sealift Ships should have "build

---

[8]      Kahn testified that he did not see Carswell's weekly reports on the date they
were written because they were not usually sent to him until the end of the month.

lists" that indicated the materials used in their construction, including the type of paint used. Plaintiff also points to the depositions of three experts who generally opined that the existence of lead paint or potential therefor on military vessels is common knowledge.

**II.   Discussion**

      A.   Summary Judgment Standards

A district court must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

When the nonmovant has the burden of proof at trial, the movant may carry its burden at summary judgment by demonstrating the absence of an essential element of the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In determining whether the movant has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the nonmovant. Anderson, 477 U.S. at 255. If the movant meets this burden, the nonmovant then has the burden of showing that summary judgment is not

-16-

appropriate by setting forth "specific facts showing that there is a genuine issue for

trial."  Fed.R.Civ.P. 56(e).

     B.    <u>Quantum Meruit</u>

     Plaintiff clearly had an express agreement with AMSEA to prepare and re-

paint a tank on the USNA ANTARES for which he was compensated in the

previous state court action against AMSEA.  In this lawsuit, plaintiff argues through

his quantum meruit claim that he also had an agreement with the government to

perform any extra work necessitated by the presence of lead paint.[9]

     Quantum meruit is known as an implied-in-fact contract.  <u>Barrett Refining</u>

<u>Corp. v. United States</u>, 242 F.3d 1055, 1059 (Fed. Cir. 2001).  "The Supreme

---

[9]     Under the common law doctrine of sovereign immunity, the government cannot be sued in admiralty without its consent.  <u>Marine Coatings of Ala. v. United States</u>, 71 F.3d 1558, 1560 (11th Cir. 1996).  The Public Vessels Act ("PVA"), 46 U.S.C. §§781-790, lifts sovereign immunity for claims involving "damages caused by a public vessel of the United States, and for towage and salvage services ...."  46 U.S.C. § 781.  The Suits in Admiralty Act ("SAA"), 46 U.S.C. §§741-752, lifts sovereign immunity for claims involving public vessels other than claims for "damages caused by a public vessel."  <u>Id.</u> at 1562 n.5 (citing 46 U.S.C. § 742 and reviewing history of PVA and SAA).  Although plaintiff purports to bring his quantum meruit claim under both the PVA and the SAA, it appears that only the SAA applies.  <u>Id.</u> (explaining that only SAA applies in case by subcontractor against government for failure to pay for repairs to naval vessels).  In any event, it makes no real difference for deciding summary judgment; both the PVA and the SAA establish subject matter jurisdiction over such disputes in the district courts.  46 U.S.C. §§ 742, 782; <u>see</u> <u>also</u> <u>Bonanni Ship Supply, Inc. v. United States</u>, 959 F.2d 1558, 1561 (11th Cir. 1992)(holding that plaintiff need not exhaust the administrative dispute resolution prerequisites of the Contract Disputes Act in order for a district court to assert jurisdiction over an action brought pursuant to the SAA).

Court has defined an implied-in-fact contract as 'an agreement ... founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" Id. (quoting Baltimore & O. R. Co. v. United States, 261 U.S. 592, 597 (1923)).

To establish an implied-in-fact contract, a plaintiff must prove: (1) a mutual intent to contract; (2) consideration; and (3) an  offer and acceptance.  Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003); City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990).  When the government is a party, a fourth requirement is added: the government agent on whose conduct the plaintiff relied must have actual authority to contractually obligate the government.  D & N Bank v. United States, 331 F.3d 1374, 1378 (Fed. Cir. 2003).  In its summary judgment motion, the government focuses on this fourth requirement.

A government agent's authority to contractually obligate the government may be express or implied.  Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221, 1235 (Fed. Cir. 2005).  A government agent has express actual authority if the Constitution, a federal statute, or a federal regulation grants the agent such authority in clear and unequivocal terms.  United States v. Flemmi, 225 F.3d 78, 85 (1st Cir. 2000).  Applicable to this case, the Federal Acquisition Regulations provide that a contract may be entered into and signed on behalf of the government by a

contracting officer.  See 48 C.F.R. § 1.602-2.  Plaintiff does not argue that he relied

on statements of Schuttler, the contracting officer, and accordingly does not argue

that he relied on statements of anyone with express actual authority.  Rather,

plaintiff argues that he relied on statements of Cisewski and Carswell, and that

together they had implied actual authority to contractually obligate the government.

A government agent's actual authority may be implied if contracting authority

is an integral part of his assigned duties.  H. Landau & Co. v. United States, 886

F.2d 322, 324 (Fed. Cir. 1989).  "Contracting authority is integral to a government

employee's duties when the government employee could not perform his or her

assigned tasks without such authority and the relevant agency regulation does not

grant such authority to other agency employees."  Leonardo v. United States, 63

Fed. Cl. 552, 557 (2005)(quotations omitted).

The doctrine of implied actual authority has been applied "cautiously and

narrowly."  Thomas v. Immigration & Nat. Serv., 35 F.3d 1332, 1335 (9th Cir.

1994)(Kozinski, J., dissenting)(citing numerous cases refusing to find implied

actual authority).  As the Claims Court explained:

> The court is of the opinion that, in some circumstances, a person with
> some limited actual authority impliedly may have broader authority.
> However, a person with no actual authority may not gain actual
> authority through the court-made rule of implied actual authority.
> Specifically, the court may not substitute itself unconditionally for the
> executive in granting authority to an unauthorized person. The most
> the court can do is interpret the limited authority of an authorized
> person in a broader manner than ordinarily would be the case. As a

-19-

> predicate to a finding of implied actual authority, there must be, at the least, some limited, related authority upon which the court can "administer" the law so as not to ignore the policies and decisions of those persons charged with managing government programs. The court believes that Landau and the theory of implied actual authority is of limited application, and was not intended to repeal the long established rule that, when dealing with the government, only government agents with actual authority can make a contract, express or implied.

California Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 27 (1990).

Plaintiff asserts that Cisewski and Carswell interacted with him to inspect, reject, approve, and direct changes, and to negotiate and stop the work.  As such, plaintiff argues that contractual authority was an integral part of the duties assigned to them.  The Court disagrees.  Cisewski testified that his duties as an MSC port engineer for the Fast Sealift Ships in his territory included independently verifying the need for improvements or work that were brought to his attention by AMSEA.  Plaintiff has not pointed to any evidence that contractually obligating the government was either necessary or integral to the successful discharge of this duty.  Cisewski could indepedently verify the need for an expenditure without negotiating or agreeing to contractual terms therefor.  Plaintiff likewise has not presented any evidence that Schuttler delegated any of his express contracting responsibility to Cisewski.  The undisputed facts show that Cisewski could only recommend work on the USNS ANTARES and other Fast Sealift Ships, subject to the approval of others in the MSC structure.  See Doe v. United States, 58 Fed. Cl.

479, 485 (2003)("[W]here ... an agency adopts internal procedures that preclude the employee from exercising [contracting] authority, it is totally inconsistent with the agency's actions to imply that the agency delegated or granted actual contracting authority.  Hence, in such cases, the doctrine of implied actual authority should not apply.")(quotations omitted).

Perhaps recognizing the weakness of his argument that Cisewski had implied actual authority to bind the government, plaintiff argues that Cisewski and Carswell, in concert, had such implied actual authority.  Again, the Court disagrees.  The undisputed facts show that Carswell was employed by AMSEA and reported to Gunter at AMSEA.  Plaintiff has not presented any evidence that the government assigned Carswell any duties, much less duties that would give him implied actual authority to contractually obligate the government.[10]

"The additional requirement of actual authority for government contracts places a significant burden on the party negotiating an agreement with a government representative."  Cruz-Pagan v. United States, 35 Fed. Cl. 59, 60 (1996).  The Supreme Court has recognized that any party contracting with the government assumes the risk of having accurately ascertained that the government agent with whom the party is dealing is acting within his authority.

_____

[10]    The Court finds that the cases cited by plaintiff are factually distinguishable. See, e.g., Jordon & Nobles Constr. Co., 91-1 BCA 23,659, 1990 WL 250368 (1990); DOT Systems, Inc., 82-2 BCA 15,817, 1982 WL 7780 (1982).

Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002)(citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947)).  This is true even when the government agent himself believes that he is acting within his authority.  CACI, Inc. v. Stone, 990 F.2d 1233, 1236 (Fed. Cir. 1993).  Plaintiff, a businessman with previous experience in performing work on government vessels, assumed the risk that any government agents on whose words or actions he relied (assuming such reliance) were not authorized to contractually obligate the government.[11]

C.    Ratification by Government Agents

Plaintiff alternatively argues that, even if the Court determines that Cisewski and Carswell did not have implied actual authority to contractually obligate the government such that his alleged implied-in-fact contract was unauthorized, he

_____

[11]    Plaintiff also argues that he is entitled to an equitable adjustment of the contract price under the constructive change doctrine.  Plaintiff asserts that Carswell's and Cisewski's recognition that plaintiff had to perform extra work constitutes a contract change for which he is entitled to an equitable adjustment. Plaintiff points to the testimony of both Carswell and Cisewski that they both believed that plaintiff was performing extra work and would be entitled to extra compensation upon the presentation of documentation and subsequent approval. Plaintiff emphasizes that AMSEA required only general information of extra work to be performed and cost to get government approval for a change order.  Like the implied-in-fact contract claim, however, plaintiff cannot recover under the constructive change doctrine because he has not presented evidence that an agent with authority to contractually obligate the government ordered him to perform extra work.  See NavCom Defense Elecs., Inc. v. England, No. 02-1063, 2002 WL 31796624, at *2-3 (Fed. Cir. Dec. 4, 2002)(explaining requirements of constructive change doctrine); see also Flink/Vulcan v. United States, 63 Fed.Cl. 292, 302 (2004)(same).

-22-

nevertheless is entitled to recovery under a ratification theory.

The government may be bound by an unauthorized agreement if a government agent with authority subsequently ratifies it.  Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1433 (Fed. Cir. 1998).  To recover under a ratification theory, a plaintiff must prove that the agent: (1) fully knew the material facts surrounding the unauthorized agreement; and (2) knowingly confirmed, adopted, or acquiesced to the unauthorized agreement.  Id.; Schism v. United States, 316 F.3d at 1289.

To prove the first requirement, a plaintiff must show that the government agent with authority had more than just general knowledge of a situation.  See Henke v. United States, 43 Fed.Cl. 15, 26-27 (1999).  "Effective ratification requires a detailed level of factual knowledge: The ratifying official must have known, at the time of ratification, the material facts and circumstances pertinent to the agreement at issue."  Leonardo, 63 Fed. Cl. at 557; see also Garza v. United States, 34 Fed.Cl. 1, 21 (1995) ("[F]or a superior official to ratify a contract, that official must have full knowledge of all the details of the matter upon which the unauthorized action was taken.").

To prove the second requirement, a plaintiff must show that the ratifying official demonstrated acceptance of the contract.  See Harbert/Lummus, 142 F.3d at 1434.  Failure to act or "[s]ilence in and of itself is not sufficient to establish a

demonstrated acceptance of the contract ... ."  Id.; see also Howard v. United States, 31 Fed.Cl. 297, 314 (1994).

Plaintiff argues that Schuttler and Lee[12] ratified any unauthorized agreement with him to perform extra work that would be required to safely handle the lead paint.  Plaintiff points to the weekly reports from  Carswell to Schuttler's and Kahn's attention that summarized the situation and to Lee's contact with Kahn from whom she learned that plaintiff had stopped working because he discovered lead paint.  The government responds that plaintiff cannot prove that either Schuttler or Lee fully knew the material facts surrounding any actions of Carswell or Cisewski, or that either Schuttler or Lee knowingly confirmed, adopted, or acquiesced to any actions of Carswell or Cisewski.

Giving plaintiff every benefit of the doubt, the facts or inferences drawn from them show at best that Schuttler and Lee generally were aware that plaintiff had discovered lead paint, that plaintiff had stopped work upon his discovery but later resumed work, that AMSEA was working with Safety-Kleen to remove and dispose of any hazardous waste, and that AMSEA was negotiating any additional costs with plaintiff.  These facts do not show the requisite knowledge of material facts or the confirmation, adoption, or acquiescence by Schuttler or Lee of any actions of

_____

[12]      Given Lee's inconsistent deposition testimony, the Court concludes that plaintiff raised an issue of fact with respect to whether Lee had implied actual authority and, for purposes of summary judgment, assumes this to be the case.

-24-

Carswell or Cisewski.[13]

     D.    <u>Institutional Ratification</u>

     Plaintiff argues further that even if the Court finds that neither Schuttler nor Lee institutionally ratified any unauthorized agreement, he nonetheless is entitled to recover under an institutional ratification theory.

     "[I]nstitutional ratification may serve to validate an otherwise unauthorized contract."  <u>Home Fed. Bank of Tenn., F.S.B. v. United States</u>, 57 Fed. Cl. 676, 689 (2003).  The modern institutional ratification theory was articulated and applied in <u>Janowsky v. United States</u>, 133 F.3d 888 (Fed. Cir. 1998).  In <u>Janowsky</u>, Federal Bureau of Investigation ("FBI") agents approached a vending business owner, informed him that he was on a hit list, and asked him to help investigate bribery, corruption, and extortion by local police officials, organized crime members, and others.  <u>Id.</u> at 889.  The FBI agents asked the owner if they could transform his business into an FBI-operated facade under which the owner would abandon legitimate accounts, purchase gambling equipment, bribe corrupt officials, and record conversations.  <u>Id.</u>  The owner agreed to do so but, concerned that the investigation would bankrupt his business, prepared, signed, and sent a contract to the FBI under which the government would compensate him for certain business

---

[13]    The Court rejects plaintiff's argument that any knowledge of Kahn or Merrell should be imputed to Schuttler or Lee.

-25-

losses.  Id.  An FBI agent forwarded it to a U.S. attorney with a letter indicating that the contract was prepared with FBI input and that the FBI headquarters had "final FBI authority with regard[] to any and all personal services contracts entered into by the FBI."  Id. at 890.  After some proposed amendments by the government and before the government ever signed a final contract, the FBI indirectly disclosed the owner as an informant, and FBI agents told the owner that he had to continue to cooperate or his and his family's safety would be compromised.  Id.  The FBI agents ended up controlling the owner's business for approximately three years.  Id. at 891.  The owner and his wife subsequently sued, alleging that the FBI breached an implied-in-fact contract to compensate them for use of the business.  Id.  The Court of Federal Claims granted summary judgment in favor of the government.  Id. at 889.

In its analysis of whether the FBI institutionally ratified an implied-in-fact contract, the Federal Circuit discussed Silverman v. United States, 679 F.2d 865 (Ct. Cl. 1981), which found institutional ratification, and City of El Centro v. United States, 922 F.2d 816 (Fed. Cir. 1990), which did not.  In Silverman, a senior Federal Trade Commission ("FTC") official promised a court reporting service that the FTC would pay for hearing transcripts.  Silverman, 679 F.2d at 868.  Based on this representation, the court reporting service sent the transcripts to the FTC, which retained and utilized them.  Id.  The senior FTC official did not have

-26-

contracting authority, but did have authority to approve vouchers for goods and services.  Id.  The court held that "[b]y accepting the benefits flowing from the senior FTC official's promise of payment, the FTC ratified such promise and was bound by it."  Silverman, 679 F.2d at 870.  In City of El Centro, a hospital alleged that the U.S. Border Patrol breached an implied-in-fact contract to compensate it for treatment of illegal aliens who sustained injuries while fleeing U.S. Border Patrol agents.  City of El Centro, 922 F.2d at 817.  The Federal Circuit rejected the hospital's institutional ratification argument and distinguished Silverman.  Id. at 821.  The Federal Circuit explained that the FTC senior official in Silverman at least had authority to approve vouchers for goods and services, and the government received a benefit from the transcripts whereas in City of El Centro, no official with any contracting authority had promised payment to the hospital, and third parties, not the U.S. Border Patrol, received the benefits.  Id. at 823.  After reviewing Silverman and City of El Centro, the Federal Circuit in Janowsky reversed summary judgment in favor of the government and remanded the case to consider whether the FBI had institutionally ratified an unauthorized agreement with the business owners by allowing the sting operation to continue and by retaining the resulting benefits.  Janowsky, 133 F.3d at 892.

Since Janowsky, several cases have considered institutional ratification.  See, e.g., Doe, 58 Fed. Cl. at 486; Home Fed. Bank of Tenn., F.S.B. v. United

-27-

States, 57 Fed. Cl. 676, 689 (2003); Sinclair v. United States, 56 Fed. Cl. 270, 281 (2003); Bailey v. United States, 54 Fed. Cl. 459, 507 (2002); Henke v. United States, 43 Fed. Cl. 15, 28 (1999); Hawkins & Powers Aviation, Inc. v. United States, 46 Fed. Cl. 238, 249 (2000); Catel, Inc., ASBCA No. 54,627, 2005 WL 1077494 (2005); Kearfott Guidance & Nav. Corp., 04-2 BCA 32,757, 2004 WL 2252910 (2004); Thai Hai, 02-2 BCA 31,971, 2002 WL 1964668 (2002);  MTD Transcribing Serv., 01-1 BCA 31,304, 2001 WL 180137 (2002).

    In all of these cited cases, institutional ratification was rejected.  Indeed, a finding of institutional ratification has been called a "rare circumstance."  Kearfott, 04-2 BCA 32,757 (quotations omitted).  In two cases representing this "rare circumstance," there has been significant government involvement with the claimant, including involvement by agents with contracting authority, demonstrating a clear acceptance of an unauthorized agreement.  See, e.g., Digicon, 56 Fed. Cl. at 426 (finding that Air Force institutionally ratified unauthorized agreement where Air Force demonstrated acceptance of unauthorized agreement by executing an express written agreement, explicitly and repeatedly recognizing the existence of the unauthorized agreement, benefitting from products and services under the unauthorized agreement for 16 months, making over $16 million in payments under the unauthorized agreement, and attempting to exit the express written agreement under the terms of the unauthorized agreement; and because individual

-28-

with unlimited contracting authority was directly involved with the implementation and oversight of the unauthorized agreement); Healthcare Practice Enhancement Network, Inc., 01-1 BCA 31,383, 2001 WL 389432 (2001)(finding that Veterans Health Administration institutionally ratified unauthorized agreement to hire a consultant to help with development of financial plan where contracting officer took part in committee meetings authorizing claimant to secure consultant, contracting officer knew or should have known of consultant's extensive activities that went on for months, and top hospital officials knew or should have known that an agreement existed and that a high level of activity was being performed under their direction by consultant).

While it is far from clear that plaintiff has not received full compensation for the work he performed through the state court action against AMSEA, even assuming that plaintiff has presented sufficient facts to raise an issue of whether the government received an uncompensated benefit from plaintiff's services, the Court finds that plaintiff has failed to present sufficient evidence that the MSC institutionally ratified any unauthorized agreement with plaintiff to perform extra work required by the existence of lead paint.  Unlike those cases finding institutional ratification, plaintiff has not presented facts showing that Schuttler, Lee, or any other MSC officials with contracting authority, or at a high level within the MSC, knew of or otherwise demonstrated acceptance by MSC of any

unauthorized agreement.

III.    **Conclusion**[14]

Plaintiff has not presented sufficient evidence to create an issue of material

fact with respect to the formation of an implied-in-fact contract or to show the

ratification of one.  Accordingly, it is hereby **ORDERED**:

1.    United States' Motion for Summary Judgment Based on a

Government Official's Lack of Authority to Bind the Government in Contract (Doc.

87) is **GRANTED.**

2.    United States' Motion to File this Reply with Incorporated

Memorandum of Law to Plaintiff's Answer to the Defendant's Motion for Summary

Judgment Based on a Government Official's Lack of Authority to Bind the

Government in Contract (Doc. 94) is **GRANTED**.

2.    Plaintiff's Answer to the Defendant's Motion to File the Attached Reply

(Doc. 95), deemed to be a motion to file an incorporated sur-reply, is **GRANTED**.

3.    United States' Agreed Motion Requesting a Fixed Trial Date (Doc. 97)

is **DENIED AS MOOT**.

---

[14]    Plaintiff's 45-page opposition sets forth several additional arguments against
summary judgment.  The Court finds that plaintiff has failed to plead and failed to
produce sufficient evidence to support claims for "superior knowledge" or breach of
an implied duty of good faith in the bid process.  The Court also rejects plaintiff's
claim that the government may not refuse to pay for services that it retains.  This is
just a restatement of plaintiff's unjust enrichment claim that the Court previously
dismissed with prejudice.

-30-

4.     Pursuant to Federal Rule of Civil Procedure 58, the Clerk is directed to enter a separate judgment in favor of defendant the United States of America and against plaintiff Carlous O. Strickland and then close the case.

**DONE AND ORDERED** at Jacksonville, Florida on May 19, 2005.

TIMOTHY J. CORRIGAN
United States District Judge

p.
Copies to counsel of record

-31-